ANTHONY GRECO, Plaintiff-Appellee, v. DR. BARRETT L. COLEMAN, Defendant-Appellant.

Fifth District   No. 5—83—0612

Opinion filed September 26, 1985.—Rehearing denied December 23, 1985.

Dunham, Boman & Leskera, of Belleville (John W. Leskera and Russell K. Scott, of counsel), for appellant.

William E. Brandt, of Granite City (George J. Moran, of counsel), for appellee.

JUSTICE KASSERMAN delivered the opinion of the court:

Defendant was found to be guilty of negligence at a second jury trial which followed a mistrial which had been declared after the jury was unable to reach a verdict. Total damages were set at $32,500. Defendant, Dr. Barrett L. Coleman, was granted leave to appeal from an order of the circuit court of Madison County which granted plaintiff Anthony Greco's motion for a new trial on the sole issue of damages. (See *Greco v. Coleman* (1984), 127 Ill. App. 3d 806, 469 N.E.2d 631.) On appeal, defendant contends that the trial court erred in granting plaintiff a new trial on the issue of damages only. Defendant prays that we reinstate the jury's verdict minus a $5,600 set-off pursuant to our supreme court's decision in *Powers v.*

*Illinois Central Gulf R.R. Co.* (1982), 91 Ill. 2d 375, 438 N.E.2d 152. Alternatively, the defendant seeks a new trial on both the issues of liability and damages.

The evidence adduced at trial indicates that on or about September 8, 1973, the plaintiff was involved in an automobile collision which caused fractures to his clavicle and odontoid process. Immediately after the collision, plaintiff was transported to the emergency room at St. Elizabeth's Hospital in Granite City, Illinois, where several X rays were taken of his clavicle and cervical spine. The radiologist who interpreted these X rays determined that they showed no fractures. Shortly thereafter, it was discovered that plaintiff had a fractured clavicle and it was immobilized by a clavicle strap. Since plaintiff was experiencing pain in the back of his head and his neck, a symptom of a possible neck fracture, his neck was immobilized by a cervical collar.

After about two weeks of plaintiff's persistent complaints of head and neck pain, the treating physician called the defendant, an orthopedic specialist, for a consultation. On September 21, 1973, the defendant reviewed the written notations of the nurse and treating physician concerning plaintiff, then went to plaintiff's room to examine him. Believing that plaintiff's pain was caused by muscle spasms rather than a fracture, the defendant removed plaintiff's cervical collar and proceeded to manipulate plaintiff's neck by moving it to different positions so he could determine its range of motion. After doing so, defendant examined the X rays taken when plaintiff was originally admitted to the hospital and determined that the X rays of plaintiff's cervical spine showed no fractures. Plaintiff was discharged from the hospital on September 26, 1973, and was released to return to work approximately one month later.

Plaintiff's head and neck pain continued unabated after his discharge from the hospital. On November 5, 1973, plaintiff sought treatment for this pain from Dr. Walter Heidke, a chiropractor. After plaintiff explained the circumstances surrounding the injury and the pain he was suffering, Dr. Heidke immediately took X rays of plaintiff's cervical spine. These X rays revealed a displaced fracture of the odontoid process, whereupon Heidke referred plaintiff to Dr. Leon Fox, an orthopedic surgeon.

On November 7, 1973, plaintiff went to Jewish Hospital in St. Louis, Missouri, to obtain treatment from Dr. Fox. Upon arrival, X rays were taken of plaintiff's cervical spine. Dr. Fox examined these X rays and those taken by Dr. Heidke and concluded that plaintiff had a forward displaced fracture of the odontoid process. Plaintiff

was immediately admitted to the hospital and placed in traction. Since plaintiff showed no signs of improvement after about 18 days in traction, he was fitted with a supporting brace and discharged from the hospital with the hope that the partial healing shown in the November 7 X rays would continue without traction.

Plaintiff continued treatment with Dr. Fox after his discharge from the hospital. When X rays taken on February 5, 1974, showed that the fracture was not healing, Dr. Fox scheduled plaintiff for bone-wire graft surgery. On March 14, 1974, bone grafts from plaintiff's hip crest were implanted around the fracture. These bone grafts were held in place by wires. After surgery, plaintiff's body was immobilized in a stryker bed, and his skull was placed in traction. Fourteen days later plaintiff was fitted with a cast extending from his head to his waist. He remained in this cast until June 21, 1974, when he was placed in a supporting brace. He remained in a brace until October 1974, when he was placed in a cervical collar. Dr. Fox agreed to let plaintiff return to work in November 1974.

At trial, plaintiff claimed that defendant's failure to recognize a possible odontoid process fracture and to properly treat it was a proximate cause of his injuries. Dr. Lee James Cordrey, an orthopedic surgeon, testified that the X rays taken at St. Elizabeth's Hospital on September 8, 1973, showed a questionable forward displacement of the odontoid process. In Dr. Cordrey's opinion, defendant was negligent for failing: (1) to recognize this possible fracture; (2) to take follow-up X rays or tomograms of plaintiff's cervical spine; and (3) to review the September 8 X rays with a radiologist in consultation. Dr. Cordrey believed that prompt diagnosis of the fracture would have made conservative, nonsurgical treatment of the fracture, such as immobilization of the neck in a plaster cast, fully effective. Dr. Cordrey did not believe that the cervical collar worn by plaintiff prior to his examination by defendant was sufficient to immobilize the fracture.

In accord with Dr. Cordrey, Dr. Walter Heidke also testified that the September 8, 1973, X rays showed a possible odontoid process fracture. Although Dr. Leon Fox refused to offer an opinion as to what the September 8, 1973, X rays showed, he stated that one would be "blind not to see" the fracture in the later X rays. Dr. Fox further testified that while plaintiff's head and neck motion was permanently reduced by 75% due to the surgery, prompt diagnosis and conservative, nonsurgical treatment may have allowed the neck to heal with no loss of motion. The plaintiff testified that although he no longer feels any pain from the fracture, his ability to perform

certain work and leisure activities is limited due to the fracture.

The defendant testified pursuant to section 2—1102 of the Civil Practice Law (Ill. Rev. Stat. 1981, ch. 110, par. 2—1102) and also on his own behalf. He testified that if a person with an odontoid process fracture has his neck promptly immobilized, the fracture has a 50% chance of healing without surgery. Although the defendant stated that a cervical collar is not sufficient immobilization for an odontoid process fracture, he admitted that the first thing which should be done when one sustains this type of fracture is to place the neck in a cervical collar. He further testified that significant movement of a previously immobilized odontoid process fracture significantly reduces the possibility that the fracture will heal without surgery. Defendant admitted that plaintiff's neck was in a good state of immobilization when he examined plaintiff.

Dr. Don C. Weir, a radiologist, saw no evidence of an odontoid process fracture in the September 8, 1973, X rays. He admitted, however, that the odontoid process appeared to be slightly displaced in these X rays and that he would have taken further X rays or a tomogram of the cervical spine to check this slight displacement. Dr. George L. Hawkins, Jr., a neurosurgeon, also saw no evidence of a fracture in the September 8 X rays. In his opinion, a substantial number of patients with odontoid process fractures need surgery to promote union of the bones even if the fracture is promptly diagnosed and immobilized in a plaster cast.

After the evidence was presented, the jury deliberated and returned with a verdict for plaintiff in the amount of $32,500. The damage award was apportioned as follows:

(1) Nature, extent, and duration of the injury $5,600.

(2) Disability resulting from the injury $5,600.

(3) Pain and suffering experienced as a result of the injuries $8,500.

(4) Reasonable expense of necessary medical care, treatment, and services rendered $100.

(5) Value of earnings lost $2,700.

(6) Diminution of earning capacity $10,000.

After judgment was entered on the verdict, plaintiff filed a post-trial motion asking for a new trial solely on the issue of damages. The trial court granted this motion with respect to medical expenses and lost earnings, but denied it as to all other elements of damage. Following our supreme court's pronouncement that nature, extent, and duration of an injury is not a separately compensable element of damages (*Powers v. Illinois Central Gulf R.R. Co.* (1982), 91 Ill. 2d

375, 438 N.E.2d 152), plaintiff made a second motion for a new trial on all elements of damages. The trial court granted this motion on the basis of *Powers*.

█ █ It is well established that whether a motion for a new trial is to be granted is within the sound discretion of the trial court and should not be disturbed unless a clear abuse of discretion appears in the record. (*Crump v. Universal Safety Equipment Co.* (1979), 79 Ill. App. 3d 202, 214, 398 N.E.2d 188, 197; *Brown v. Johnson* (1978), 60 Ill. App. 3d 76, 78, 378 N.E.2d 757, 758-59.) Since, as a general rule, a new trial will not be granted on the ground that damages in personal injury actions are considered to be inadequate, appellate review of the granting of a new trial limited solely to the issue of damages is essentially a review of the trial court's discretion. An abuse of discretion will be found where there is no recognizable basis in the record to support the granting of a motion for a new trial. (*Nicholl v. Scaletta* (1982), 104 Ill. App. 3d 642, 647-48, 432 N.E.2d 1267, 1272.) After carefully reviewing the record on appeal, we cannot say that the trial court abused its discretion.

The question of damages is one of fact for the jury and courts will not interfere with the jury's assessment of damages unless: (1) the award is palpably inadequate or a proved element of damages has been ignored; or (2) the amount of the verdict is shown to be erroneous or the result of passion or prejudice; or (3) it clearly appears from the uncontradicted evidence that the amount of the verdict bears no reasonable relationship to the loss suffered by plaintiff. *Kern v. Uregas Service of West Frankfort, Inc.* (1980), 90 Ill. App. 3d 182, 194-95, 412 N.E.2d 1037, 1047.

There is sufficient evidence to support the trial court's determination that the damages awarded to plaintiff were inadequate. Plaintiff, who was a foreman at Granite City Steel at the time he sustained his injuries, earned $18,825.33 during 1973. Since the record indicates that plaintiff missed at least 13 months of earnings as a result of his injury, we cannot say that the trial court abused its discretion when it found the $2,700 award for lost earnings to be palpably inadequate and out of concert with the uncontradicted evidence. Similarly, although the precise amount of medical expenses cannot be ascertained from the record, the amount of medical expenses incurred by plaintiff was clearly in excess of the $100 awarded to him. Moreover, we note that the trial court did not grant a new trial on all issues of damages until our supreme court's pronouncement in *Powers v. Illinois Central Gulf R.R. Co.* (1982), 91 Ill. 2d 375, 384,

438 N.E.2d 152, 156, that the nature, extent, and duration of a plaintiff's injuries are not a separately compensable element of damages. As applied to the instant verdict, *Powers* would have required the trial court to reduce plaintiff's damage award by $5,600. Since this amount represents a 20% reduction in plaintiff's total damage award, and since the trial court had previously found two compensable elements of damages inadequate, we cannot say that the trial court abused its discretion by ordering a new trial on all issues of damages on the basis of *Powers*. We note that although defendant did not file a post-trial motion, the *Powers* issue is preserved for review because *Powers* was the basis for plaintiff's post-trial motion. 87 Ill. 2d R. 366(b)(2)(v).

■ Nevertheless, a new trial on damages alone will not be ordered unless: (1) the jury's verdict as to the issue of liability is amply supported by the evidence; (2) the questions of damages and liability are so separate and distinct that a trial limited to damages alone is not unfair to the defendant; and (3) the record suggests neither that the jury reached a compromise verdict, nor that in some other identifiable manner, the error which resulted in the jury awarding damages also affected its verdict on the question of liability. *Robbins v. Professional Construction Co.* (1978), 72 Ill. 2d 215, 224, 380 N.E.2d 786, 790; *Kern v. Uregas Service of West Frankfort, Inc.* (1980), 90 Ill. App. 3d 182, 195, 412 N.E.2d 1037, 1047.

■ In the instant case, there is evidence which amply supports the jury's finding of liability. To find a physician liable for negligent medical practice, the plaintiff must affirmatively establish the appropriate standard of care, that the defendant violated this standard of care, and that defendant's lack of skill or care caused harm to plaintiff. Expert testimony is usually necessary to establish these factors. (*Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 471, 473 N.E.2d 1322, 1332-33.) In the instant case the defendant was shown to be fully aware that the plaintiff exhibited symptoms indicative of a possible odontoid process fracture and that the fractured clavicle was originally misdiagnosed. Nevertheless, defendant manipulated plaintiff's neck prior to viewing the X rays, either by himself or in consultation with a radiologist. Furthermore, by defendant's own admission, he manipulated a neck in a good state of immobilization, knowing that manipulation of a previously immobilized neck would significantly reduce a 50% chance that a fracture in that neck would heal without surgery. When these facts are considered in light of Dr. Fox' testimony that some healing of the fractured odontoid process was shown in the November 7, 1973, X rays, it cannot be said that the jury's

finding of liability was not amply supported by the evidence.

Further, it is our conclusion that the issues of damages and liability are so separate and distinct that a new trial on damages alone will not be unfair to the defendant. Plaintiff was never alleged to have negligently contributed to his own injury. Although others may have been concurrently liable for part or all of plaintiff's injuries, concurrent liability with others will not excuse the defendant from liability. *Ray v. Cock Robin, Inc.* (1974), 57 Ill. 2d 19, 23, 310 N.E.2d 9, 11-12; *Millette v. Radosta* (1980), 84 Ill. App. 3d 5, 24, 404 N.E.2d 823, 838.

■ Finally, we are of the opinion that the damage verdict was not the result of a compromise on the issue of liability. To test whether a verdict on liability is the result of compromise, it must be determined if the verdict was amply supported by the evidence. (*Paul Harris Furniture Co. v. Morse* (1956), 10 Ill. 2d 28, 46, 139 N.E.2d 275, 286; *Kelty v. Wiseman Construction Co.* (1976), 38 Ill. App. 3d 808, 813, 349 N.E.2d 108, 111.) The evidence of liability must be so clear on this point that there is no real issue for a second jury to try. (*Sommer v. City of Taylorville* (1978), 59 Ill. App. 3d 765, 767, 375 N.E.2d 1031, 1032.) There is no real issue of liability for a second jury to try because the jury's verdict on this point was amply supported by the evidence. Furthermore, we find nothing in the record which objectively indicates the subjective feelings of the jurors on the issue of liability. The cases cited by defendant, *Almanza v. Austino* (1980), 83 Ill. App. 3d 354, 403 N.E.2d 1297; *Ervin v. Neil* (1980), 81 Ill. App. 3d 5, 400 N.E.2d 667, in support of his contention that the jury reached a compromise verdict are distinguished on this basis.

Since we conclude that a new trial on damages alone is proper in this cause, we need not address the other issues raised by defendant.

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed and this cause is remanded for a new trial on the question of damages only.

Affirmed and remanded.

JONES, P.J., and KARNS, J., concur.